I would like to reserve three minutes for rebuttal. I'm not going to go over the facts in the briefs because I think I've made it painfully clear what my position is on the reasoning employed by the board and by the IJ in this case. I would like to try to paint a little broader brush. When I first reviewed the decisions in this case, as is my habit in an immigration appeal, I stopped with that before I dig deeper into the record. And when I looked at the record in this case, I was struck, I was put in mind of a, of all things, a Sherlock Holmes mystery case. It was called Silver Blaze. And in that case, our wonderful detective, Mr. Holmes, was put on the proper scent that led to the solution of the case, not by what the, what had happened in the case, but by what didn't happen in the case. That was the case of the dog that didn't bark. When I looked at the decisions in this case, I was struck. They are interpreting California law, and not one, not the IJ, not the board, cited one single California case that interpreted and applied 7611 to the Family Code. To me, that was the dog that didn't bark. The IJ and the board were not asked to write on a clean slate. Statutes, as this Court well knows, don't interpret themselves. They don't apply themselves. That's what appellate courts do on a regular basis. When does a statute apply and under what circumstances and why? If they had looked at California authority, and there's substantial California authority on legitimation of a child, they would have discovered that presumed fatherhood is not a gift. It's not like winning the Westchester Kennel Club show best dog in show. It's got to be earned. It's, the courts speak of it as an elevated status. And there's a reason for that. The Supreme Court and all the appellate courts that have addressed this issue have said, in order to achieve presumed parenthood status, and in this case, presumed fatherhood status, the presumed parent has to demonstrate a full commitment to the welfare of the child, a full commitment to developing a substantial familial relationship. Now, I have referred in this case to this father as the footloose father, and I did that with an obvious reason. The record certainly, the facts support that. But to me, it is fundamentally inconsistent between a, to have a footloose father given the status of presumed fatherhood. It's, if you look at the record, and it's hard to calculate exactly how much this presumed father was present in this child's life, but if I had to calculate it, I would say probably no more than 5 or 10 percent of the time over this nine-year period that the IJ looked at. Is this a factual question? Is this a factual question? Are there facts in dispute on this issue? I don't think there are any facts at all in dispute. And the facts, in my mind, lead to one conclusion, and that is, he didn't run father. But what you're asking us to do is, because I agree with you, I agree with the opinions, too, and they don't mention any California cases and don't apply the proper law to the facts. So you're saying these facts are undisputed. I, I. And you're asking us to apply California law to determine whether or not, under California law, the, the board was wrong. I, absolutely, Your Honor, because California law, I think everybody agrees, controls. As a matter of immigration law, that was in effect at the time. It says the question of whether a child can, under the circumstances, be entitled to derivative citizenship based upon his mother's becoming a citizen, and he otherwise qualified, the only impediment is if the father is considered the presumed parent. And a footloose sperm donor is not a parent. There is far more to parenting than simply showing up at his own invitation, staying a week or a month or two months, and then disappearing for, for months and years at a time. I mean, that's what the record tells us. Now. Let me ask you this. I think you've got a pretty good case that we're not dealing with Ozzie Nelson here. I mean, but the question I have is 8 U.S.C. 1252 says that if the petitioner claims to be a national of the United States, that's your guy, claims to be a national of the United States, and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, doesn't say it has to be disputed, just the issue is presented. The court shall transfer the proceedings to a district court to go ahead and then make, do whatever it's supposed to do. Why shouldn't we refer this case to the district court and say there's an issue of whether he's a national of the United States, district judge, figure it out? Well, because I don't think it's a legitimate question presented. He claims to be a national of the United States. By virtue of diversity of citizens. For whatever reason, he presents that claim. Why shouldn't we say to the district judge, decide whether that's true or false? Well, I don't think, first of all, I think that would be a kind of a futile gesture in the sense that I don't think there's going to be any question as to what a district court judge applying California law is going to decide under the facts of this case. I don't think the facts of this case are going to change. It's clear that the IJ blew it. We know that because he purported to apply a statute which had been repealed before my client was even born. And it went downhill from there. And we certainly wouldn't want to send it back to the BIA. I get that. But, I mean, I guess I'm wondering if this record was even fully developed before the BIA. I mean, I'm inclined to agree with you that this father did not legitimate the sentence. I don't know if the record's been fully developed sufficiently that we could actually say that. Well, I don't know what else would be necessary to be developed. We have the testimony of the two key witnesses who had material. We don't have the father, though. Well, nor does the son. Nor has the son. That fact is going both ways for me. Right. And how do we even find out where the father is? The last time we looked in 2009, he apparently was living in Miami. With his other children. With his other children. With his other family. With his other family where my client had never been taken. Is that in the record that he'd never even been held out in Miami as the father's child? Well, there's no evidence, I don't think, one way or another, candidly, as to what the father was doing. My client, as far as I know, never. Is that in the record? Well, I don't think there was any evidence that he had ever taken. The only place of interaction. You wouldn't have to put that in the record. No. But the only place of interaction. Wouldn't the government have to put that in the record to prove that he was legitimatized by the father? And for the same reason why they would have had to put in the record anything else that was relevant that bore on that issue. They didn't do that. The two witnesses who testified, and they were credible witnesses, was Caesar Jr.'s mother and Caesar Jr. himself. And they made it real clear, as far as I'm concerned, that the only point of interaction my client and his sperm donor father ever had was on these sporadic, temporary, and infrequent visits when the father invited himself into the mother's apartment before he departed for parts unknown again. It's simply, to me, to send this back to any agency for further findings would be primarily, in my view, a waste of time. The question, and I know, Judge Silverman, you often ask, what do we do with it from here? If we agree with, if you agree with me, I don't think there's anything to be done other than reversing it. Because if my client was not legitimated by his birth father. You mean grant the petition for review. Correct. And he has the same status that you and I have by virtue of our birth, and that he has by virtue of his mother's being, becoming a citizen, and that is he is a United States citizen. Period. Okay. Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court. My name is Kosei Yukimori, and I represent the United States Attorney General in this case. This petition for review should be denied because the petitioner is not a United States citizen, and having been convicted of a violent, aggravated felony, he was properly ordered to move to his native country of Nicaragua. Let me ask you a question just to get off the, to get the ball rolling here. Are there any facts that are disputed with respect to his relationship with his father? That's just the sole question I'm asking. There are no disputes with respect to historical facts, but I believe opposing counsel and I may differ on the inference to be drawn. The government's position is that the only inference to be drawn in this case is that petitioner was legitimated by his father, and therefore there are no genuine issues of fact. Well, did he, is there any dispute about whether or not he ever lived in his father's home? Not as a matter of fact, Your Honor. It's undisputed that the petitioner's father represented that his home address was in tax returns in 1995, 1996, and 1997, was the same address that petitioner resided in. He also represented to the IRS in 1994 and 1995, as well as the INS in 1990 and 1991, that the father resided with the petitioner and petitioner's mother. Let me make sure I understand. I don't want to put words in your mouth. I want to make sure I understand what you're saying. Yes, Your Honor. I think you're saying you don't, there's no really disagreement about the facts. You, these are just legal calls that you would have us make. He would have us make it the other way. Yes, Your Honor. And so there would be no reason to send this case to the district court or anywhere else. Right, Your Honor. There's no, there are no facts that are at dispute. Okay. Were Caesar Jr. and his mother deemed credible? Their testimony was not deemed adversely, was not deemed, yes, they were deemed credible. It was not an adverse credibility. Yes, it was not an adverse credibility. So that means they were deemed credible. They were, Your Honor. And petitioner's father, in addition to representing officially that his permanent residence or one of his residences were with petitioner's mother and petitioner, it's also undisputed that he spent substantial amounts of time with petitioner actually at the residence. The mother testified as to months at a time. The petitioner testified that. This clearly wasn't his residence. It was the mother's residence. Well, it was a shared residence, Your Honor. The father represented that it was his home address, both to the IRS and the INS. Did he ever pay the rent? That is not clear, Your Honor. But what is undisputed in the record is what the mother testified to, which is that every time the father was paid, he gave $200 to $300 to the mother. So it's every time he was paid, he gave money. And $200 to $300, while the amount may not seem like much, if this Court were to look at the petitioner's father's tax returns that are submitted in the record, it's approximately 30 to 60 percent of his income. If that's true, how does that make that his home? Well, it is his home because it is a shared home, Your Honor. Because not only does he claim it as his residence, it is undisputed that he spent time there. It is also undisputed that while he was there. Where was he the rest of the time? It is unclear from the record, Your Honor. Didn't they say that he, in the record, didn't the IJ say that he went to Miami where his children and family were? Well, there's evidence in the record. Did the IJ say that? Well, what the IJ stated was that there's evidence in the record of a 1994 W-2, which states that he may have had a residence in Miami. But the government doesn't argue that the father was. . . It sounds like this guy might have had two families. That's a possibility, Your Honor. The mother testified that there was another, that the father had other children with another mother. That's in the mother's testimony, Your Honor. Let's suppose there are some facts that support what you're saying. David's address to the IRS, for example. But there are a whole lot of other facts that show he just drops in from time to time. It's not really his home. Why do we do that? Well, Your Honor, first of all, the government would dispute that because it's not just his official representation. It's not just the fact that it's undisputed that he spent months there, and according to the petitioner's testimony, up to a year with them. It's not only that the mother and the petitioner both testified that the father is. . . Yeah, the California courts, I mean, I don't know how much she looked into all of this, but they seem to require a lot more. In that case of, what's the case, was it Charisma? Yeah, Charisma. I mean, they went on and on and on about changing diapers and, you know, details of parenthood, actually parenting that's required by California law. We don't have that here. What we also don't have, Your Honor, is any contest, Your Honor.  Well, he's a biological father, certainly. He is, Your Honor. And he is a biological father. The mother accepted him. . . He didn't necessarily give you parental rights. No, Your Honor. But there's more than just the fact of his biology here, Your Honors. It all starts from Nicaragua when the petitioner was born. The petitioner is named after the father. The mother testified that Nicaragua does not recognize a child unless both parents registered the birth, and the father was there to register the birth. His name is on the birth certificate. He lived in Nicaragua from time to time in the same way that he lived with the family in the United States, up to a period of six months is what the mother testified to. And then he left. Who left first? He left first, Your Honor. He left first, and he went to, I guess, Guatemala and then to Miami. Or maybe I've got backwards. Mexico and then Miami. And then later on, she left, and he left the kids. Yes, Your Honor. However, Your Honor, as soon as petitioner's father entered the United States, he filed an asylum application attempting to grant or trying to specifying as derivative beneficiaries of his asylum application his son, identified as petitioner, and also his wife, which is identified as petitioner's mother. That application was denied, Your Honors, and the petitioner's family did move to California. But as soon as they moved to California, the father, notwithstanding him having relatives in Miami, uprooted from California, moved to California, informed the INS that he has moved residence. And she became a lawful, the mother became a lawful permanent resident. Is she a citizen now? Yes, yes, in 1999, Your Honor. So if they were really living together as husband and wife in one family, why wouldn't he have then moved to a death status based on that? Well, they're not married, Your Honor. So the mother wouldn't be able to petition the father. And they have never been married. That much is true, Your Honor. But what is undisputed in the record is a history beginning in Nicaragua with the birth of the child through when they entered the United States. He contributes financially. He represents that this is his residence. He represents it's undisputed that he actually lived in the residence. There's also coordination, Your Honors. The immigration judge noted that the tax returns in the case where the father claimed the petitioner's younger brother as a dependent. Now, all these people living in the same household, they all filed tax returns. Did he claim petitioner as a dependent? No, Your Honor. He is not. Maybe he was homeless, and so he needed an address. That's not clear in the record, Your Honor. Excuse me. Go ahead. It's not so hard. What is clear in the record, Your Honor, is that the father claims his residence as the petitioner's mother and petitioner's residence. On a couple of tax returns. Well, in 1994, 1995, 1996, 1997, also in 1990, and even in 2001, he represented that back to the INS. And he never represented to the INS that Cesar Jr. was a dependent? No, Your Honor. It does not appear so from the record. But even afterwards, in 2005, the petitioner himself testified that his father was living for six months during the time he was involved in criminal contacts. Here's the thing. It seems to me California law applies here, right? Yes, Your Honor. This California legal question boils down to whether the father ever received this guy into his home. Is that right? And whether the father held the child out. Okay. Let's say you've got the second half. Let's say, yes, he's held him out. But you still have to have the first half. You still have to find that he's received the child into his home. Yes, Your Honor. Looks like there may be a factor two in your favor on that point, but a whole lot of other evidence goes the other way. What do we do then? Well, if that's the conclusion, if that's a reasonable inference that the court decides upon, then transfers to the district court would be appropriate because there would be genuine issues of material fact. That being said, we do not think that that's the case here. Petitioner knew from the very get-go that he needed to prove that his father did not legitimate him. Whose burden is it? It is his burden, Your Honor. Because he is the negative? Yes, Your Honor. He is. He admitted that he is. He admitted his alienation. Therefore, the presumption applies. And he bears the burden by preponderance of evidence that he is a United States citizen. And this is all of the evidence that he submitted to prove that he was not legitimated. Right. Well, it's his burden to show that he is the child of an American citizen, his mother, and that no other parent, recognized parent of his is an American citizen, that any other is an American citizen. Yes, Your Honor. Generally, both parents are required in order to automatically confer United States citizenship. Right. But if one is an American citizen and the other has not affirmatively chosen to recognize him as his child under the California law, the father is not counted in the determination of whether he is the child of an American citizen. Well, it's ‑‑ if I understand your question correctly, if the father was required to undergo some procedure in California courts to affirmatively establish paternity, well, there would be no reason to ‑‑ No, I'm not saying that. In order to establish that the father had legitimated the child, there would have to be a showing under the California law that he had affirmatively treated him as his child. Yes, Your Honor. Yes. Recognized him, if you will. And the fact that he wasn't married to his mother doesn't help a lot on that. No, Your Honor. But the fact that the father has been a part of the family unit since the very beginning, since Petitioner was born, is evidence of his commitment. On and off. Well, as the circumstances would permit, Your Honor. Well, we don't know that. Well, what we do know is that when the father left Nicaragua, he knew that according to his asylum application, he did so because he feared persecution. And when he came to the United States, he tried to bring his family, relocate his family to the United States by according a derivative status. But he wasn't ‑‑ he never became an American citizen. Yes, Your Honor. So how does he get to some kind of effort for his family? Did he try to legitimate his wife as well? I mean, his ‑‑ Your Honor, it's the conduct throughout the period that constitutes the legitimating act, Your Honor. Right. But you're saying he applied to legitimate him. How is that shown? I'm sorry, Your Honor. I may have misspoken. I did not say that he ‑‑ Well, in his asylum application, you say he didn't seek asylum for this man, did he? If I may take a step back. The father filed an asylum application. And in the asylum application, he stated that he wanted to accord whatever benefits that he might receive to his son and his wife. But that's not enough, right? He didn't ask for asylum for them. Yes, Your Honor. It is not enough. But what it does indicate is that this is a family. No, but it doesn't ‑‑ you're making the same mistake that the IJ and BIA did, which is you're not applying California law to the facts that we have, to the undisputed facts in the record. No, Your Honor. California law permits a shared home to constitute the home in which the father can receive the child. And this broad reading is consistent with California law's policy in finding that all children should ‑‑ well, encouraging a finding that children should not be left with only one parent. Well, there's no question when a father goes to court to recognize his paternity, that's what happens. But that's not what we have here. This father never sought a judgment of a court that he was the father of this boy. Right. And under California law, that is not necessary. What is only necessary is that the father receive the child into his home and also that the child ‑‑ Well, treat him publicly as his child. Right. And there's not a lot here that supports the notion that the father publicly accorded the son the status of his child. There is, Your Honor. Apart from comments in some asylum application. Well, do you have the mother's testimony? The mother testified that she introduced the father as her husband and also her children's father. He had the potential ‑‑ Introduced him where? To ‑‑ Well, she certainly wanted her neighbors to think she was married, if that's what we're talking about. Yes. That's how she held herself out in public. And this was so things would stay simple. I would introduce him as the father of my children. This is AR-431, Your Honor. Also at AR-401, Petitioner ‑‑ 404, I'm sorry. When he introduced ‑‑ this is a question to Petitioner. Right. But the law requires that the father treat them publicly as his children, not the mother. Well, this is evidence of a father receiving a child into his home and ‑‑ Well, it's evidence that the mother wanted her neighbors to think she was married. And that is relevant under California law, Your Honor. Is it? Well, I see you're out of time. Did you want to wrap up? I think you're done. Thank you very much. I've got five minutes. Thank you. I'm sorry, Your Honor. Okay. Thank you. We're going to hear now back from Mr. Beilack. Thank you, Your Honor. I will be as brief as I can. This thing about tax returns listing the mother's residence as his, that's kind of a red herring. Even the I.J. found that he sometimes did that even when he wasn't staying there. So it's a meaningless assertion. It's a meaningless fact. Yeah, but who's the decider? Do we decide that or do we send it to the district judge to ‑‑ Well, I think decide what? Whether he ‑‑ Number one, dodged the child as his own, and B, that he's received him into his home. I think the evidence is clear, and the answer is no on both scores. This question of birth certificate listing, that's another red herring. How about the tax return issue? Again, it's ‑‑ what does it mean? It means he's using it. It means he's using that residence as his address. He could have used the post office boxes. He could have. That's who decides that. I understand that. But, I mean, who decides whether he's using it as a mail drop or that he's living there? Well, I think the facts speak for themselves. But there's something more significant here, and that is even if he had met all the tests, and he hasn't met any of them, frankly, for the reasons I set forth in my brief, parenthood is more than sharing a roof, living under the same roof. If I may quote from the case of S.Y. versus S.B. That was the government was good enough to submit a Rule 28J letter brief last week, raise this case. It's a California case. And it really, I think, puts a point on the entire thing, if I may. The appellate court was quoting from the trial court's findings of fact. This is not a case where a person cared for the children of someone she was dating just because she happened to be dating the other. It's actually quite the reverse. The relationship between the parties lasted longer than it otherwise would have for the sake of the children and because S.Y. was devoted to the children. This is not a case where S.Y. just cared for the kids because it was convenient or because of self-interest. S.Y. made personal, professional, and financial sacrifices to care for the children. A person occasionally spending the night on the couch would not do all the things S.Y. did. Okay. I see you're over your time, Mr. Bialak. Thank you. Thank you. Maury, thank you very much as well. The case is submitted and will stand in recess for the morning. Thank you.
judges: Cedarbaum, Silverman, Wardlaw